PROCESS CONTROLS             )
INTERNATIONAL, INC., d/b/a   )
AUTOMATION SERVICE,          )
                             )
    Plaintiff,              )
                             )
    vs.                     )    Case No. 4:10 CV 645 CDP
                             )
EMERSON PROCESS              )
MANAGEMENT, et al.,          )
                             )
    Defendants.             )

## MEMORANDUM AND ORDER

This is an antitrust and false advertising dispute arising from defendants' refusal to deal with plaintiff and from one defendant's advertisements declaring the superior safety of its products. Plaintiff Process Controls International, Inc., doing business as Automation Service ("Automation"), remanufactures used process control equipment originally manufactured by defendant Emerson Process Management. The remanufacturing process involves completely disassembling the equipment, inspecting and cleaning its parts, and reassembling it after inspection. Emerson also remanufactures its own products through its Encore division.

Defendant Factory Mutual Insurance Company insures industrial companies that use process control equipment. In an effort to increase safety and reduce its clients' premiums, Factory Mutual's subsidiary, defendant FM Approvals, LLC has created a set of safety standards for process control equipment and certifies companies as 'FM approved' if their products satisfy its standards. One of these standards includes an Original Equipment Manufacturer ("OEM") requirement, which requires a remanufacturer such as Automation to enter an agreement with an original manufacturer like Emerson to provide the remanufacturer with safety and equipment updates. Emerson's Encore brand has been certified as FM approved because it has access to Emerson's information, and Emerson has advertised this fact as well as the superior safety of its Encore brand as compared to other remanufacturers without FM certification.

In the face of Emerson's advertisements, Automation tried to have its products certified as FM approved, but it could not, because Emerson refused to enter an OEM agreement with it. Automation now brings this complaint, alleging all defendants unlawfully agreed (1) to restrain its sales by refusing to certify its products as FMA approved, and (2) to monopolize the market for remanufactured Emerson products, in violation of federal and Missouri antitrust laws. Automation also claims Emerson's advertisements are false and violate the Lanham Act, 15

U.S.C. § 1125, and amount to tortious interference with a business expectancy and defamation under Missouri law. For the reasons that follow, I will grant defendants' motions to dismiss Automation's antitrust claims, but I will deny Emerson's motion to dismiss Automation's Lanham Act and state-law claims. I will also grant intervenor Fisher Controls International, LLC's unopposed motion to intervene.

## Background[1]

Plaintiff Automation Service remanufactures process control equipment, which is used to control and/or regulate the flow of hazardous substances through piping systems. Such equipment is originally manufactured by companies such as defendant Emerson, but Automation and several other companies, including Emerson through its Encore brand, remanufacture it because some consumers prefer to replace their worn-out equipment with used, but remanufactured equipment rather than brand-new equipment. Remanufacturing involves completely disassembling equipment, replacing all faulty parts, inspecting and cleaning all parts, testing the proper functioning of parts, and reassembling the equipment. When Automation remanufactures Emerson equipment, it leaves the

---

[1]These well-pleaded facts are taken from Automation's complaint and are considered as true for the purposes of this Memorandum and Opinion. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

Emerson trademarks on the equipment on it because its customers wish to match existing equipment with equipment from the same brand, but it also marks the equipment as remanufactured.[2]

Defendant Factory Mutual Insurance Company insures industrial companies that use process control equipment. Its subsidiary, defendant FM Approvals, has established safety standards for these companies and certifies certain process control equipment as "FM approved" if it satisfies the safety standards. Companies that use FM-approved equipment are entitled to discounts on their insurance premiums from Factory Mutual. In 1998, FM Approvals created a set of safety standards for remanufactured process control equipment, which included the Original Equipment Manufacturer requirement: to be certified, a remanufacturer must enter an agreement with the original equipment manufacturer according to which the original manufacturer will provide the remanufacturer with product and safety updates. Emerson's Encore brand of remanufactured equipment satisfies this requirement and has been certified as FM Approved, because it has access to Emerson's product updates. Emerson has

---

[2]This practice has led to several on-going disputes between Emerson and Automation, with Emerson contending Automation's failure to remove Emerson's marks amounts to a trademark violation. The latest iteration of this dispute ended in a settlement between the parties and a release of their claims for any activities before December 13, 2007.

advertised that fact, and has asserted in its advertisements that this certification makes its products safer than other, non-FM-certified remanufactured process control equipment. Emerson has also sent letters to Automation's customers containing this same message. Additionally, Emerson is Factory Mutual's largest insurance client, and several of Emerson's officers are also members of Factory Mutual's boards.

After discovering Emerson's advertisements and letters to its clients, Automation attempted to have its products certified as FM approved. FM Approvals informed Automation about the OEM requirement, and Automation attempted to enter such an agreement with Emerson. However, Emerson refused to enter any such agreement with Automation. Automation then requested that FM Approvals relax the OEM requirement for it, but FM Approvals also refused. To this date, Automation's products have not certified as FM approved.

In the face of defendants' refusal to deal with it, Automation brought this complaint alleging that it has lost customers because of defendants and that their behavior violates federal and state antitrust laws as well as state law. Specifically, in Counts I and II, Automation claims that defendants conspired together to restrain Automation's sales by creating the OEM requirement and then refusing to certify Automation's products because of Emerson's refusal to enter such an

agreement with Automation, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In Counts III-VIII, Automation asserts that defendants have conspired to monopolize, have attempted to monopolize, or have successfully monopolized the aftermarket of remanufactured Emerson process control equipment, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Automation next claims in Count IX that Emerson's advertisements and letters are false, in violation of the Lanham Act, 15 U.S.C. § 1125. Additionally, Automation asserts in Counts X and XI that this same behavior amounts to tortious interference with a business expectancy and defamation under Missouri law. Finally, Automation claims in Count XII that it is entitled to declaratory judgment that its activities, including leaving Emerson's marks on the process control equipment it remanufactures, does not amount to a violation of any trademark law.

Factory Mutual and FM approvals now move to dismiss all counts against them, Counts I-II, V, and VI-VII. Emerson also moves to dismiss all claims except Automation's claim for declaratory judgment. Intervenor Fisher Controls International, LLC, a company related to Emerson, moves to intervene as of right under Fed. R. Civ. P. 24(a), because it actually owns the trademarks that are the subject of Automation's claim for declaratory judgment in Count XII. Automation does not oppose that motion, but it does oppose all motions to dismiss.

**Discussion**

As discussed above, defendants' motions to dismiss and Fisher's motion to intervene are pending before me. I will first consider the motions to dismiss and then Fisher's motion to intervene.

## I. Sherman Act Section I Claims

Citing Fed. R. Civ. P. 12(b)(6) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), all defendants move to dismiss Automation's Section 1 claims (Counts I-II), contending that the complaint fails to plausibly suggest defendants conspired or agreed to restrain Automation's sales. I agree.

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. When considering a 12(b)(6) motion, the court assumes the factual allegations of a complaint are true and construes them in favor of the plaintiff. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). When, as here, a plaintiff attaches an exhibit to its complaint, that exhibit is considered to be part of the pleadings. Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); *see also, e.g., Cole v. Homier Distrib. Co.*, 599 F.3d 856, 863 (8th Cir. 2010) (in deciding a motion to dismiss, a court may consider the allegations made in the complaint, documents

attached to the complaint, and matters of public and administrative record referenced in the complaint).

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Twombly*, the Supreme Court clarified that Rule 8(a)(2) requires complaints to contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . ." 550 U.S. at 555; *accord Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Specifically, to survive a motion to dismiss, a complaint must contain enough factual allegations, accepted as true, to state a claim for relief "that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 129 S. Ct. at 1949; *Hamilton v. Palm*, No. 09-3676, 2010 WL 3619580, at *1 (8th Cir. Sept. 20, 2010). Plausible claims allow courts to draw "the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. However, if a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief" and should be dismissed for failure to state a claim. *Id.* (internal quotation marks and citation omitted). Determining whether a claim for relief is plausible is a context-specific task requiring the court to draw on its judicial experience and common sense. *Id.* at 1950.

In considering whether a claim is plausible, a district court may begin by identifying which of plaintiff's allegations are mere legal conclusions; the court may disregard those conclusions, because they "are not entitled to the assumption of truth." *Id.* The court may then consider the remaining nonconclusory factual allegations to determine whether they give rise to a plausible claim. *Id.*

Here, Automation claims all defendants, by refusing to enter agreements with it or to certify its products as FM approved, unlawfully conspired to restrain its sales, in violation of the Sherman Act, 15 U.S.C. § 1 and the equivalent Missouri antitrust statute, Mo. Stat. Ann. § 416.031.[3] Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States . . . " 15 U.S.C. § 1; *see also Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1033 (8th Cir. 2000) ("Section 1 prohibits concerted action by two or more parties in restraint of trade."). Because Section 1 does not prohibit individual actions that have a restraining effect on trade – even if taken because the actor knew others would do the same, *see, e.g., Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988), the main issue in Section 1 cases is typically "whether the

---

[3]Because Missouri antitrust law is to be "construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes," Mo. Stat. Ann. § 416.141, I will apply the same federal law to the Missouri antitrust claims that I apply to the federal antitrust claims.

challenged conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

Applying Section 1's concerted action to the context of a motion to dismiss, the *Twombly* Court held that a Section 1 complaint states a claim for relief if it plausibly alleges that defendants agreed to restrain trade. *Twombly*, 550 U.S. at 556. In the absence of any direct allegations of an agreement, a plaintiff's allegations are plausible if placed within a factual context suggesting a preceding agreement between defendants to restrain trade when viewed though the lense of common economic experience. *See id.* at 565; *see also id.* at 557 ("Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.").

For instance, in *Twombly*, the plaintiffs alleged an agreement between "Baby Bell" defendants – regional telephone monopolies created in the wake of the 1984 divestiture of the American Telephone & Telegraph Company – to prevent market entry by new regional telephone companies. *See id.* at 548. Aside from conclusory allegations of an agreement or conspiracy, which the Court

disregarded, plaintiffs' allegations of an agreement were based solely on defendants' parallel conduct, including their uniform resistance to the new companies entering their respective markets. *Id.* at 564-66. Because defendants' alleged parallel activity could just as well have been "the natural, unilateral reaction of each [defendant] intent on keeping its regional dominance," as the result of a prior, unlawful agreement, the Court held that the complaint failed to state a Section 1 claim that was plausible on its face. *Id.* at 570; *see also DM Research v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) (dismissing Section 1 complaint for failure to adequately plead an agreement, because it was implausible to infer that defendants, a private, standard-setting body and an organization of medical professionals, would have any reason to agree "to adopt a faulty standard" that effectively banned the use of plaintiff's products in laboratories).

In contrast, the Second Circuit recently held that a Section 1 complaint survived *Twombly* and plausibly alleged an agreement between music industry defendants to restrain the sales of online music and fix the prices at which online music was sold. *See Starr*, 592 F.3d at 317. Like the *Twombly* plaintiffs, the *Starr* plaintiffs based their allegations of an agreement on defendant's parallel conduct – including charging unreasonably high prices for online music despite lowered

production costs. *See id.* at 323. But unlike the *Twombly* plaintiffs, the *Starr* plaintiffs placed their parallel conduct allegations in a context plausibly suggesting a prior agreement. *Id.* Specifically, defendants' alleged failure to lower the price of their online music despite lower production costs would have reduced their market share and their profits, unless all defendants had agreed to do the same. *Id.* at 327. Because plaintiffs' allegations of defendants' parallel conduct suggested defendants' unreasonably high prices would only have been profitable if set pursuant to a prior agreement – and were not just the result of defendants' natural and unilateral business activities – plaintiffs stated a Section 1 claim. *Id.*; *see also Standard Iron Works v. Arcelormittal*, 693 F. Supp. 2d 877, 896-97, 902 (N.D. Ill. 2009) (plaintiffs plausibly alleged an agreement in violation of Section 1 when they not only alleged that defendants' actions were parallel, but also that defendants' collective reduction in steel production was only profitable if done by all of them).

Here, Automation asserts that a plausible inference of a prior agreement can be reasonably inferred from the following allegations:

1.      Several Emerson board members and directors are also members of FM's boards and executive council.

2. In June of 2009, Automation requested FM Approval to certify Automation's remanufactured Emerson process control equipment as complying with FM Approval's standard for remanufactured process control equipment.

3. FM Approvals responded soon afterwards that Automation would need Emerson's written authorization before Automation's certification could be approved. In particular, FM Approvals required Automation to enter a written agreement with Emerson that ensured Automation's access to Emerson's product servicing information.

4. Automation sent several requests for Emerson's authorization, but Emerson responded that it was not interested in entering an agreement with Automation.

5. Automation informed FM Approval about Emerson's refusal to deal with Automation and requested an exemption from that requirement, but FM Approvals refused.

Defendants respond that these allegations are insufficient for me to plausibly infer that they previously agreed to restrain Automation's sales, because their alleged refusal to deal with Automation could just as well have been independent action. I agree.

I note first that Automation's complaint never directly alleges that defendants agreed to restrain Automation's sales. For example, the complaint does not allege that defendants met sometime before 1998 to discuss how they could draft FM Approval's remanufactured equipment safety standards to prevent Automation from ever being certified. Nor does Automation allege that Emerson threatened or otherwise unduly influenced FM Approval in an effort to get it to create the OEM Agreement requirement.[4] Instead, Automation alleges that several Emerson directors and board members are also members of the FM defendants' boards, but those allegations stop short of asserting that these employees had any influence in creating the OEM Agreement requirement. *Compare American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 560-63 (1982) (defendant, a private, standard-setting corporation, liable under agency theory for its members' Section 1 violations, including members actively using their positions to unduly influence the creation of safety standards in an effort to reduce sales of plaintiff's product). Moreover, it is well established that the mere

_____

[4]In its complaint, Automation does allege: "Emerson has been a strong proponent of the FM OEM Agreement Requirement." But this statement is conclusory, and without any factual allegations supporting it, I need not accept it as true. *See Iqbal*, 129 S. Ct. at 1949-50. I have disregarded other conclusory statements for the purposes of my analysis.

opportunity to conspire, even in the context of parallel business activity, is insufficient to state a Section 1 claim. *See Blomkest*, 203 F.3d at 1036.

In the absence of such direct allegations, Automation's complaint can only survive if it places its Section 1 claims in a context plausibly suggesting a prior agreement. *See Twombly*, 550 U.S. at 557. Automation attempts to satisfy this requirement by asserting that defendants had an "interactive exchange," i.e., that through their series of alternating denials of Automation's requests for FM Approval certification and for an agreement with Emerson, defendants had knowledge of each other's activities and somehow agreed – during this exchange – to restrain Automation's sales. But in the absence of allegations of defendants' prior agreement, defendants' mere knowledge of each other's activities does not amount to a Section 1 violation. *Cf. Blomkest*, 203 F.3d at 1032-33 ("Evidence that a business consciously met the pricing of its competitors does not prove a violation of the antitrust laws."). Additionally, Automation's allegation that defendants agreed sometime in the middle of their "interactive exchange" is conclusory and must be disregarded. *See, e.g., Iqbal*, 129 S. Ct. at 1949-50. Even if the allegation were more than conclusory, Automation must allege that defendants' agreement *preceded* their allegedly unlawful conduct in order to state a plausible Section 1 claim. *See Twombly*, 550 U.S. at 557.

Automation's other attempts to nudge their allegations of an agreement from the conceivable to the plausible similarly fail. Citing *Starr* and *Standard Iron*, Automation contends that FM Approval's OEM requirement supports an inference of a prior agreement, because, Automation asserts, the requirement is against the FM defendants' self-interest, so it could only have been created as a result of a prior agreement with Emerson. Specifically, Automation contends (1) FM and FM Approvals have a business interest in certifying as many products possible, because this will increase their revenue and will also increase the number of FM-certified products on the market; (2) the OEM requirement prevents the FM defendants from certifying as many products as possible; and (3) there is no safety reason to require Automation or any other remanufacturer to enter an agreement with an OEM.

I disagree that Automation's inference – that the OEM requirement could only have come about because of a prior agreement – is the only possible inference to be drawn from these factual allegations. *See Twombly*, 550 U.S. at 566. First, it is well settled that "the failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1." *Greater Rockford Energy & Tech. v. Shell Oil*, 998 F.2d 391, 396 (7th Cir. 1993); *accord DM Research*, 170 F.3d at 58. Second, as discussed above, the OEM requirement was created in

1998 – eleven years before Automation applied for certification. As the FM

defendants point out, FM Approval's rejection of Automation's application could

just as well have been because Automation's products did not meet FM

Approval's standards. The complaint itself alleges that FM Approvals's safety

standards were developed to ensure a product's safety and decrease the risk of

loss. It also alleges that these safety standards are so widely accepted that third

parties rely on standards as accurate indicators of safety. It is conceivable that FM

Approvals might want to maximize its profit by certifying as many products as

possible and thereby collect more application fees, and so it might be against FM

Approvals's self-interest to deny Automation's application. But it is also possible

that FM Approvals wants to avoid watering down its standards by certifying too

many products that do not meet its safety criteria, and so its denial of

Automation's application "could just as well be independent action." *See id.* at

557, 566 (no basis to infer a prior agreement when defendants' conduct was a

natural reaction to competition); *DM Research*, 170 F.3d at 56 (no basis to infer

agreement to write exclusionary safety standard when standard-setting bodies did

not compete with plaintiff); *cf. Brookins v. International Motor Contest Ass'n*, 219

F.3d 849, 855 (8th Cir. 2000) (affirming summary judgment against plaintiffs'

Section 1 complaint because there was no evidence that standard-setting defendant

"had a financial incentive to accede to the wishes of" plaintiffs' competitors);

*compare Starr*, 592 F.3d at 327 (plaintiffs' agreement allegations plausible when

defendants's prices and services "were so unpopular as to ensure that nobody in

their right might would want to purchase the music, unless the defendant's rivals

were doing the same.") (internal quotation marks omitted).[5]

Next, Automation points to its allegation that FM Approvals refused to

allow Automation an exception to the OEM Requirement, even though FM

Approval's standards are "flexible."  But, just as with Automation's other

allegations, FM Approval's failure to waive its OEM requirement, without more,

is insufficient for me to infer an agreement.  *Cf. Greater Rockford*, 998 F.2d at 397

("The failure to take emergency steps to specify gasohol and proceeding through

the normal specification process, however, is not evidence of an unlawful

purpose.").

In the face of the complaint's absence of any factual allegations about the

creation of the OEM requirement, and its other, factually neutral allegations, any

conclusion that defendants agreed to create this requirement in order to restrain

---

[5] Automation's failure to plausibly allege a prior agreement also makes irrelevant its arguments about the reasonableness of FM's OEM Agreement requirement.  *See DM Research v. College of Am. Pathologists*, 170 F.3d 53, 54-56 (1st Cir. 1999) (even assuming *arguendo* that plaintiff could ultimately prove at trial that defendant's safety guideline was unnecessary, plaintiff failed to state a Section 1 claim when it failed to plausibly allege an agreement between defendants to create the guideline in order to restrain trade).

Automation's sales would be speculative. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Accordingly, Automation has failed to plausibly suggest an agreement among defendants, and I must dismiss its Section 1 claims, Counts I & II. *See id.* at 570.

## II. Sherman Act Section Two Claims

In Counts III-VIII of its complaint, Automation asserts claims of monopolization, attempted monopolization, and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and its Missouri-law equivalent, Mo. Stat. Ann. § 416.031. Specifically, Automation asserts that Emerson has monopolized or attempted to monopolize the market for remanufactured Emerson process control equipment by agreeing or conspiring with the FM defendants to prevent Automation's products from being certified as FM approved, by refusing to enter an OEM agreement with it, and by falsely advertising that its own Encore brand of remanufactured products is safer than Automation's.

As a preliminary matter, I note that Automation's attempted monopolization claims, Count V, against FM Insurance must fail, because FM Insurance does not remanufacture process control equipment and so does not compete in the proposed market with Automation. *See Little Rock Cardiology*

*Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1141 (E.D. Ark. 2008) ("No one can monopolize a market if he does not produce the product or deliver the services constituting the market, which is to say that no one can monopolize a market in which he does not compete. No one can attempt to monopolize a market without attempting to compete in that market."), *aff'd*, 591 F.3d 591 (8th Cir. 2009) (dismissal of non-competitor not an issue on appeal); *cf. Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996) ("[I]t is axiomatic that a firm cannot monopolize a market in which it does not compete."), *vacated on other grounds*, *NYNEX v. Discon, Inc.*, 525 U.S. 128 (1998). I must also dismiss Automation's conspiracy-to-monopolize claims, Counts VII & VIII, against all defendants for the same reason that I dismissed its Section 1 claims – Automation has failed to plausibly allege any agreement or conspiracy between defendants. *See RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, (E.D.N.Y. 2009) (dismissing complaint's Section 1 claims and Section 2 conspiracy-to-monopolize claims for the same reason – the complaint's failure to plausibly suggest a conspiracy between the defendants), *aff'd*, No. 09-4406-CV, 2010 WL 3393737 (2d Cir. Aug. 30, 2010); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (*Twombly's* pleading standard for an agreement or conspiracy is the same for Section 1 and Section 2 claims).

Accordingly, the only remaining antitrust issues are Automation's actual monopolization and attempted monopolization claims against Emerson, Counts III-VI. 15 U.S.C. § 2 makes it a felony to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. To prevail on its Section 2 claim, Automation must plead and eventually prove that Emerson (1) possessed monopoly power in the relevant market, and (2) willfully acquired or maintained that power, as opposed to gaining it as a result of a superior product, business acumen, or historical accident. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *accord Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). Similarly, the elements of attempted monopolization include: (1) Emerson's specific intent to monopolize the market; (2) Emerson's predatory or anticompetitive conduct directed to accomplishing its unlawful purpose; and (3) a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). In addition, to have standing to assert private damages under federal antitrust laws, a private litigant such as Automation must allege that it has suffered an antitrust injury. *Lovett v. General Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992) (citations omitted).

In its motion to dismiss, Emerson argues that, aside from failing to plausibly plead a conspiracy, Automation has also failed to allege that Emerson has any monopoly power, that the relevant market is limited only to remanufactured Emerson equipment, that Automation has suffered an antitrust injury, or that Emerson has engaged in any anticompetitive behavior. After reviewing Automation's complaint, I conclude that, even if I agree that the relevant market is limited to remanufactured Emerson process control equipment, Automation has failed to plausibly allege that Emerson has any monopoly power in that market.[6]

For its monopolization and attempted monopolization claims to survive Emerson's motion, Automation must adequately plead that Emerson has monopoly power or a dangerous probability of achieving monopoly power in the proposed relevant market. *See Grinnell*, 384 U.S. at 570-71; *Spectrum Sports, Inc.*, 506 U.S. at 459. Monopoly power has been defined as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). More specifically, monopoly power is "the power to charge a price higher than the competitive price without inducing so rapid and great an

---

[6]Because this failure is fatal to Automation's Section 2 claims, I need not determine whether Automation has plausibly alleged Emerson's anticompetitive behavior or its own antitrust injury.

expansion of output from competing firms as to make the supracompetitive price untenable." *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quoting *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991)); *see also SMS Sys. Maint. Servs. Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999) ("In its most basic iteration, the monopolist's market power consists of having sufficient economic muscle to permit it to raise prices well in excess of competitive levels without inducing customers to turn elsewhere.").

Part of the calculus of determining whether a defendant has monopoly power is the consideration of the relevant market and whether the defendant has monopoly power in that market. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *E.I. du Pont de Nemours & Co.*, 351 U.S. at 404. Generally, a valid relevant market has two components: a product market and a geographic market. *See Spectrum Sports*, 506 U.S. at 459; *Double D*, 136 F.3d at 560. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325; *accord Double D*, 136 F.3d at 560 (the relevant product market includes all reasonably interchangeable products). The relevant geographic market consists of the

geographic area in which consumers can feasibly seek alternative products, or "the market area in which the seller operates." *Double D*, 136 F.3d at 560 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

As a general rule, if a plaintiff plausibly alleges a relevant market and a defendant's dominant share of that market, a court may infer a defendant's monopoly power. *See Harrison Aire*, 423 F.3d at 381 ("In a typical section 2 case, monopoly power is inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers.") (internal citation and quotation marks omitted). The issue of a defendant's monopoly power over a relevant market is made more complicated, however, when, as here, the plaintiff limits the relevant market to a product's aftermarket. *See, e.g., SMS*, 188 F.3d at 16 ("Cases involving aftermarkets are *sui generis*."). Courts have limited the relevant market to a product's aftermarket in certain circumstances, *see, e.g., Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451, 477, 482 (1992), but it is not unusual for a manufacturer servicing its own products to have a high percentage of the services aftermarket for those products. *See SMS*, 188 F.3d at 16. Accordingly, courts considering whether a manufacturer has monopoly power in the aftermarket for its own products have considered various factors in addition to the manufacturer's dominant share in that market, including: a defendant's

24

supracompetitive pricing; significant information costs that prevent a primary market consumer from considering the life-cycle costs of a product, including the cost of servicing or replacing it; high switching costs that prevent a consumer from purchasing another firm's product; and a defendant's ability to exclude other market entrants into the aftermarket. *See, e.g., Harrison Aire*, 423 F.3d at 383-85; *SMS*, 188 F.3d at 18-24; *cf. Eastman Kodak*, 504 U.S. at 464-77 (for Section 1 purposes, plaintiffs produced sufficient evidence of Kodak's market power in the aftermarket for Kodak copy machine service and parts, even if Kodak had no dominant market power in the primary market for copy machines, when, *inter alia*, Kodak was able to prohibit third parties from selling Kodak parts to plaintiffs and there were high information costs in the primary market preventing consumers from considering the life-cycle costs of Kodak's products).

Here, Automation asserts that Emerson has monopoly power or a dangerous probability of achieving monopoly power in the aftermarket of remanufactured Emerson process control equipment. Specifically, Automation refers to the market in which consumers replace their worn-out Emerson process control equipment with remanufactured, used Emerson process control equipment, as opposed to brand-new process control equipment. Automation claims that the product market is limited only to remanufactured Emerson equipment because

25

consumers prefer to buy the same brand of equipment to replace their old equipment, and because using other equipment from another brand may not be financially feasible because it introduces training, maintenance, and logistical difficulties. Thus, Automation argues, remanufactured Emerson process control equipment is not reasonably interchangeable with other process control equipment. Automation also claims that Emerson has monopoly power or a dangerous probability of achieving monopoly power in this market, because only its Encore brand of remanufactured Emerson process control equipment is certified as FM approved. Additionally, Automation claims that Emerson has, through its false advertising and letter campaign extolling the superior safety of its Encore brand as compared to other remanufacturers' brands, frightened consumers into purchasing Encore to the exclusion of other remanufacterers' products. Finally, Automation asserts that Emerson has a dominant share of this market.

I conclude that, even if I accept Automation's market definition and limit the relevant product to the aftermarket for remanufactured Emerson process control equipment,[7] Automation has failed as a matter of law to plausibly allege

---

[7]I have serious doubts as well about whether Automation has adequately alleged that the relevant market should be limited to the aftermarket for Emerson products. Specifically, Automation fails to include any of the factual allegations found in complaints in cases in which courts have limited the relevant market to the aftermarket. *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 383 (3d Cir. 2005) (factors include (1) supracompetitive pricing, (2) defendant's dominant share of the relevant aftermarket; (3) significant information

that Emerson has any monopoly power or even a dangerous probability of achieving that power in that market. To begin with, Automation's assertion that Emerson has a dominant share over this market is conclusory and thus cannot support its claims. *See Iqbal*, 129 S. Ct. at 1949-50 (district courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Nor does Automation support this conclusion with any factual allegations from which I could reasonably infer that Emerson maintains a dominant share of the relevant market. *See id.* For instance, Automation does not allege that Emerson controls a certain high percentage of the market. *Cf. Eastman Kodak*, 504 U.S. at 481

---

costs that prevented life-cycle pricing by primary market consumers; and (4) high "switching costs" that serve to "lock in" a defendant's aftermarket customers). For instance, Automation does not plead that Emerson has changed anything in its business relationship with consumers after consumers have already purchased Emerson equipment and are "locked in" without any choice for switching products, such as forcing its customers to sign contracts requiring them to purchase only its Encore brand of remanufactured products before it will agree to service their products. *Compare Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 458 ("In 1985 and 1986, Kodak implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines."). Instead, Automation alleges that "the emergence of a Remanufactured . . . market drives down the retail price of new Valves [sic] Assemblies, Components and Instrumentation." In the face of Automation's assertion that activities in the aftermarket affect prices in the primary market – in effect, that the two markets have such an information exchange that what happens in one affects what happens in the other, I have doubts that the market should be so limited. *Cf. SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999) ("Given that the primary market's ability to check a firm's behavior in its own aftermarket hinges in substantial part on whether information about the latter is sufficiently reflected in the former, the transparency of DEC's allegedly monopolistic policy represents a salient departure from the *Kodak* scenario."). In any event, Automation has failed to plausibly allege any monopoly power or dangerous probability of monopoly power by Emerson, and its Section 2 claims must be dismissed.

("Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is . . . sufficient to survive summary judgment under the more stringent monopoly standard of § 2."); *see also American Tabacco Co. v. United States*, 328 U.S. 781, 797 (1946) (defendant's control of over two-thirds of the market amounted to a monopoly). In fact, Automation's complaint provides no description whatsoever of the market structure for remanufactured Emerson process control equipment.

Indeed, the other allegations in Automation's complaint cut against its assertion of Emerson's dominance in the remanufactured market. In particular, Automation alleges that Emerson's process control equipment is "often" remanufactured by it as well as other, third-party remanufacturers. In addition, although Automation alleges that Emerson's Encore division remanufactures Emerson process control equipment, Automation also alleges that it is the largest remanufacturer. These allegations do not indicate a market dominated by one firm, but rather a market with several participants who compete with each other to offer remanufactured process control equipment.

Moreover, while Emerson's allegedly false advertising could constitute anticompetitive behavior, *see International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1270 (8th Cir. 1980), Automation does not allege

that this behavior has allowed Emerson to increase its market share to the exclusion of Automation and other third-party remanufacturers. *Compare Eastman Kodak*, 504 U.S. at 458 (Kodak's anticompetitive behavior, including forcing third parties to stop selling parts to plaintiffs, succeeded in preventing third parties from obtaining Kodak parts and forced many out of business). Automation does allege that it has lost some customers because of Automation's activities, but without a more factually detailed description of the respective market share of the parties and other market participants, I cannot conclude what, if any, exclusionary effect Emerson's behavior had on market participants such as Automation.

Finally, Automation fails to allege any other indicia of monopoly power in the aftermarket, including Emerson's charging supracompetitive prices. In the face of Automation's failure to include any factual detail about Emerson's or its own market share, and its other allegations indicating a competitive market with several participants, I cannot reasonably infer that Emerson monopolized or is in dangerous proximity to monopolizing the remanufactured Emerson equipment market. *See Iqbal*, 129 S. Ct. at 1950 (district courts should dismiss a complaint when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct"). Without such factual detail, any conclusion that

29

Emerson had monopoly power would be purely speculative at best, and Automation's obligation at the pleading stage is to include enough factual allegations "to raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.

### III.  Lanham Act Claims

In Count IX, Automation claims Emerson has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by falsely advertising that its Encore brand of remanufactured products are safer than other remanufactured products, such as Automation's.  Arguing none of its statements are literally false, Emerson moves to dismiss these claims.  Because I conclude that plaintiff has sufficiently alleged the falsity or misleading nature of these statements, I must deny Emerson's motion as to Count IX.

Section 43(a) of the Lanham Act prohibits persons from making false or misleading representations of fact in commercial advertisements about their own or another person's goods.  *See* Lanham Act § 43(a), codified at 15 U.S.C. § 1125(a).  The purpose of the Act is "to protect persons engaged in commerce against false advertising and unfair competition."  *Allsup, Inc. v. Advantage 2000 Consultants, Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005) (internal citation omitted). Under Eighth Circuit law, Automation states a claim for false advertising if it

alleges that: (1) Emerson made false statements of fact about its own or another's product; (2) the statements actually deceived or had the tendency to deceive a substantial portion of the audience; (3) the deception was material; (4) Emerson caused the false statement to enter interstate commerce; and (5) Automation has been or is likely to be injured because of Emerson's false statement. *See, e.g., id.*

Under the first element, a statement is false if it is either (1) literally false as a factual matter; or (2) literally true or ambiguous, but misleading in context or likely to deceive consumers, because it implicitly conveys a false impression. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). However, many advertising claims fall into a non-actionable third category of statements known as "puffery" or "puffing." *Id.* "Puffery is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)." *Id.* (internal quotation marks and citation omitted); *see also Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038, 1052-53 (9th Cir. 2008) (puffery includes vague, subjective, or generalized statements, such as defendant's claim that it would provide its customers with "flexibility" and "low costs"). By contrast, a claim is an actionable statement of fact if describes "specific or absolute characteristics of a product," or includes

"specific, measurable claims of product superiority based on product testing."

*United Indus.*, 140 F.3d at 1180.

To determine whether a statement is literally false, a court must analyze the claim conveyed in full context, *see Rhone-Poulenc Rorer Pharm., Inc.*, 93 F.3d 511, 516 (8th Cir. 1996), but whether claim is literally false is typically an issue of fact. *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34 (1st Cir. 2000). Similarly, whether a statement is misleading is generally a question of fact. *See id.* at 36-37 (reversing a district court's determination that a statement was not misleading "because whether advertising is misleading depends on what message was actually conveyed to the viewing audience.") (internal quotation marks and citation omitted); *see also Newcal Indus.*, 513 F.3d at 1053-54 (district court erred by dismissing plaintiff's misleading advertising claims because there remained "a factual question of whether the statement was intentionally *misleading* at the time it was made.") (emphasis in original).

Here, Automation attaches to its complaint several articles and advertisement written by Emerson and its employees, which, Automation claims, make false statements about the relative safety of Emerson's remanufactured products compared to other remanufactured products. For instance, in exhibit seven to Automation's complaint – a flyer Emerson created in 2006 and sent to

potential customers – Emerson describes how its products are safer than other

remanufacutred products because of the remanufacturing process it employs:

> All Valves are disassembled, blasted down to bare metal, with PMI
> testing conducted on all wetted parts by a factory-trained evaluator.
> Ultrasound technology is used to confirm that the body wall
> thickness is compliant with the original design as engineered by
> Fisher to meet the ASME B16.34 standard.

> At every step in the remanufacturing process – from welding to
> machining to reassembly to testing to painting – a quality control
> checklist ensures that the unit complies with industry and regulatory
> standards.

A few lines below this claim, Emerson states in bold and larger text, "**Nobody else**

**can do this.**"  By contrast, Automation alleges in its complaint that its

remanufacturing process produces no less safe a remanufactured product than

Emerson's, as Automation's process "involves completely disassembling a control

valve or instrumentation, replacing all parts subject to wear, thoroughly inspecting

and cleaning all parts, testing and verifying the proper functioning of all integral

parts, reassembling and retesting the control valve or instrumentation."  Emerson

responds that none of its statements are literally false, presumably because

Emerson's Encore brand of remanufactured products are certified as FM-

approved, while Automation's are not.[8]

---

[8]Emerson also argues that these statements cannot form the basis of any Lanham Act
liability, because none of them mention Automation or its products by name.  This argument

33

Having reviewed the entire complaint and the attachments thereto, I conclude that Automation has sufficiently alleged the falsity or misleading nature of these statements to state a claim under the Lanham Act. I note first that none of the statements Automation points to are non-actionable puffery, because they all are specific, measurable claims. In particular, Emerson claims, for example, that its products have been put through a remanufacturing process involving several safety steps that ensure the products comply with all industry and regulatory standards, and that no other remanufacturer uses such a process. Statements such as these are "capable of being proved false," and so are actionable. *See American Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2004) (internal quotation marks and citation omitted). Additionally, the issue of whether such statements are literally false or misleading is a factual question, making dismissal of Automation's claims inappropriate at this time. Specifically, Automation has alleged that it follows a comprehensive remanufacturing process similar to the one described by Emerson in its advertising literature, making its

misses the mark. While the statements do not mention Automation or its products by name, they do name Emerson's own Encore brand of remanufactured products and assert the superior safety of those products compared to other remanufacturer's, and it is well established that a plaintiff may bring a Lanham Act action based on a defendant's false statements about its own products. *See* 15 U.S.C. § 1125(a); *see also, e.g., Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34-35 (1st Cir. 2000) (plaintiff, manufacturer of chlorine bleach, stated a claim under the Lanham Act when defendant claimed its laundry detergent made clothes whiter than chlorine bleach).

remanufactured products just as safe as Emerson's. Although it is literally true based on Automation's other allegations that Emerson's remanufactured equipment is certified as FM approved and Automation's equipment is not, whether that certification makes Emerson's products safer is a factual question, and Automation has also alleged that FM only certifies the intrinsic safety of electrical components, not the safety of remanufactured equipment's pressure control capacities. Because Automation has alleged adequate factual detail for me to reasonably infer that Emerson's claims of superior safety are literally false or misleading, I must deny Emerson's motion to dismiss Automation's Lanham Act claims. *See Iqbal*, 129 S. Ct. at 1949.

## IV. State-Law Claims

This same alleged behavior by Emerson – its false advertising and letters sent to Automation's customers proclaiming the superior safety of its Encore brand of remanufactured products – also forms the basis of Automation's claims for tortious interference with a business expectancy and defamation under Missouri law (Counts X and XI). Emerson moves to dismiss each of these claims. I will consider the adequacy of each in turn.

## A.  Tortious Interference With a Business Expectancy

Under Missouri common law, Automation can state a claim for tortious interference with a business expectancy by alleging: (1) a contract or valid business expectancy; (2) Emerson's knowledge of the contract or relationship; (3) Emerson's intentional interference causing a breach of the contract or relationship; (4) absence of justification for Emerson's interference; and (5) Automation's damages resulting from Emerson's conduct.  *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990) (en banc).

After reviewing these exhibits and the allegations in Automation's complaint, I conclude that Automaton states a claim for tortious interference.  Just as with its Lanham Act claims, Automation's tortious interference claims are supported with sufficient factual detail about the safety of its products to state a claim that Emerson's claims in its letters to Automation's customers are false and misleading.  Thus, Automation has adequately alleged that Emerson intentionally interfered with its business expectancy.  *Cf. id.* at 373 (defendant did not tortiously interfere with plaintiff's business expectancy when plaintiff failed to allege any "improper means" of interfering with plaintiff's business, including "misrepresentation of fact, threats . . . or any other wrongful act recognized by statute or common law.").  The letters attached to Automation's complaint also

reveal that Emerson was aware of Automation's sales to these companies, as each starts by claiming, "It has come to our attention that your facility may have purchased surplus or remanufactured Rosemount transmitters."

In its briefs, Emerson asserts that it was justified in sending such letters, because these customers are also its own customers, and it was concerned for the safety of its customers. However, under Missouri law, "[i]t is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interests, but in doing so employs improper means." *Id.* at 372; *cf. also id.* at 372 (defendant justified in interfering in plaintiff's business expectancy – a policy of title insurance, because defendant was the "beneficial party to the title insurance policy" and "had an economic interest in the proposed policy."). These letters, together with Automation's allegations about the safety of its products, could support an inference that Emerson's actual motive was to draw Automation's customers away by falsely claiming Automation's products were unsafe. Accordingly, Automation has stated a claim for tortious interference, and Emerson's motion must be denied as to Count X.

## B. Defamation

Under Missouri law, the elements of a defamation claim include: (1) publication, (2) of a defamatory statement, (3) that identifies the plaintiff, (4) that is false, (5) that is published with the requisite degree of fault, and (6) damages the plaintiff's reputation. *State ex rel. BP Prods. N. Am., Inc. v. Ross*, 163 S.W.3d 922, 928 (Mo. 2005) (en banc). Defamation actions must be brought within two years the time when a plaintiff is damaged or ascertains that she is damaged. *See* Mo. Stat. Ann.§§ 516.100, 516.140; *Jordan v. Greene*, 903 S.W.2d 252, 254-55 (Mo. Ct. App. 1995).

In its motion to dismiss, Emerson contends Automation's defamation claims fail because (1) none of its articles or letters specifically mention Automation or its products; (2) it is true that Emerson's products are safer than Automation's; and (3) Automation's claims are barred by the two-year Missouri statute of limitations.

Automation's complaint survives Emerson's statute of limitations defense. Emerson is correct that some of the exhibits incorporated into Automation's complaint as examples of Emerson's defamatory statements were created in 2006 and 2007, which is more than two years before Automation filed its complaint in April of 2010. However, other exhibits are from within the two-year period, and

Automation alleges that Emerson's defamatory activities continue to the present, including Emerson publishing articles on its website and sending letters to Automation's customers.  Most importantly, under Missouri law, the accrual date for defamation actions is the date when plaintiff is damaged or ascertains that she is damaged, *see Jordan*, 903 S.W.2d at 255, and Emerson does not argue that Automation was injured or ascertained its injuries greater than two years ago. Indeed, the factual allegations in Automation's complaint plausibly suggest Automation only recently discovered Emerson's activities after Automation's customers either ceased business with Automation or requested Automation to explain it safety procedures.  Whether Automation is able to support its allegations with evidence remains to be seen, but for purposes of Emerson's motion to dismiss, Automation has sufficiently alleged its injuries arose within the two-year statute of limitations.

Emerson's other arguments to dismiss Automation's defamation claims also fail.  Although Emerson is correct that Automation never alleges Emerson's defamatory statements named Automation, and that none of the exhibits incorporated into the complaint name Automation or its products, statements are still actionable under Missouri law even if they do not refer specifically to a plaintiff by name, as long as the reader reasonably understood the statements to be

directed to plaintiff.  *See May v. Greater Kan. City Dental Soc'y*, 863 S.W.2d 941,

945 (Mo. Ct. App. 1993).  "If some question exists as to whether the offensive

words are 'of and concerning' the plaintiff, the fact dispute is for the jury."  *Id.*

Automation has sufficiently alleged that a reader would reasonably understand

Emerson's statements to be referring to Automation.  Specifically, Automation

alleges that it is the largest and highest quality remanufacturer and is well known

in the industry, and that Emerson has directed its letters disparaging the safety of

remanufactured equipment to Automation's customers.  Because Automation has

alleged sufficient factual detail from which a finder of fact could conclude that

Emerson's articles and letters refer to Automation, Emerson's argument fails.

Finally, as I detailed above, the issue of whether Emerson's products are

safer than Automation's is a factual question.  As with its Lanham Act and tortious

interference claims, Automation has sufficiently alleged the safety of its own

products as compared to Emerson's, and, accordingly, factual questions remain as

to the truth or falsity of Emerson's claims of superior safety.

## V.  Release

In Emerson's motion to dismiss, it asserts that the settlement agreement

entered between Automation and other Emerson entities on December 13, 2007

releasing all of their claims from before that date bars any of Automation's claims

from before that date. Automation agrees, contending that all of its claims for false advertising, tortious interference, and defamation arise from Emerson's activities after that date. After reviewing the allegations in Automation's complaint together with the attachments thereto, including the 2007 agreement, I conclude that Automation states claims based on Emerson's activities after the 2007 agreement and, accordingly, its claims based on activities after that date are not barred by the agreement.

### VI. Fisher's Motion to Intervene

As discussed above, intervenor Fisher moves to join this litigation of right under Fed. R. Civ. P. 24(a) and to assert counterclaims for Automation's infringement of its trademarks and breach of an earlier settlement agreement. Because Automation does not oppose that motion, and because I conclude that Fisher, as the true owner of these trademarks, is entitled to intervene of right under Rule 24(a), I will grant its motion.

### Conclusion

Because I determine that Automation has alleged no set of well-pleaded facts from which I can reasonably infer that defendants conspired to restrain its sales or to monopolize the remanufactured Emerson process control equipment market, I must dismiss its Section 1 claims (Counts I and II), and its Section 2

conspiracy-to-monopolize claims (Counts VII and VIII) against all defendants. Additionally, because Factory Mutual does not compete in the relevant market, Automation cannot state claim against it for attempting to monopolize, so I must dismiss Count V against Factory Mutual. Automation has also failed to allege that Emerson has any monopoly power in the relevant market, and I will dismiss all remaining Section 2 claims (Counts III-IV). However, Automation does state claims for false advertising, tortious interference, and defamation, so I will deny Emerson's motion to dismiss these claims (Counts IX, X, and XI). Finally, I will grant Fisher's motion to intervene of right.

Thus, Automation's claims for false advertising, tortious interference, and defamation remain against Emerson. Automation's claim for declaratory judgment also remains, as well as Fisher's counterclaims in intervention against Automation for trademark infringement and breach of the 2007 settlement agreement. All parties are reminded of their obligation to file responsive pleadings within the time set by the Rules, and this case will be set for a Scheduling Conference pursuant to Fed. R. Civ. P. 16 by a separate Order. At the Scheduling Conference, the parties are expected to be prepared to discuss whether Documents #7, #8, and #35 should be removed from seal and placed in the public file.

Accordingly,

42

**IT IS HEREBY ORDERED** that defendants Factory Mutual's and FM Approval's motion to dismiss [#27] is granted, and Automation's complaint against these defendants is dismissed with prejudice.

**IT IS FURTHER ORDERED** that defendant Emerson's motion to dismiss [#30] is granted in part to the extent that Counts I-VIII against it are dismissed with prejudice, and is denied as to the remaining counts.

**IT IS FURTHER ORDERED** that intervenor Fisher's motion to intervene [#32] is granted. The proposed counterclaim [#35] is deemed filed as of this date, and plaintiff is reminded of its obligation to file a responsive pleading within the time set by the Rules.

_Catherine D. Perry_
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 10th day of November, 2010.