UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PROCESS CONTROLS INTERNATIONAL, INC., d/b/a AUTOMATION SERVICE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:10CV645 CDP |
| EMERSON PROCESS MANAGEMENT, et al., | ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

On November 10, 2010, I issued a Memorandum and Order dismissing the antitrust claims brought by plaintiff Process Controls International, Inc., doing business as Automation Service ("Automation"). That order dismissed all claims brought against defendants Factory Mutual Insurance Company and FM Approvals, LLC, but it denied the motion to dismiss with regard to other claims brought against defendant Emerson Process Management.

Plaintiff Automation has now filed a motion to amend the complaint, in an attempt to cure the defects in its antitrust claims. The parties have also filed motions to strike portions of one another's pleadings, and in response to the motion to strike, Emerson seeks to amend its answer. Yesterday Automation filed a motion seeking an extension of the deadline for amending pleadings, and Fisher

Controls International, LLC (a party related to Emerson) filed a motion for leave to amend its counterclaim.

Because I conclude that Automation's proposed amended complaint does not cure the defects that led me to dismiss its complaint in the first place, I will deny its request for leave to amend the complaint to reassert the antitrust claims. I will deny both motions to strike, and will provide a limited amount of additional time to seek further amendments.

## Discussion

### I. Motion to Amend

Automation seeks leave to amend its complaint to reassert its antitrust claims under three separate Federal Rules of Civil Procedure: 15(a), 59(e), and 60(b). Fed. R. Civ. P. 15(a) provides that, if a responsive pleading has already been served, a party "may amend its pleading only with . . . the court's leave," which the court should grant "freely . . . when justice so requires." Rule 59(e) allows a party to file motions to alter or amend a judgment within twenty days after entry of judgment and Rule 60(b) allows a court to relieve a party from a final judgment, order, or proceeding for several enumerated reasons, including a party's mistake, inadvertence, surprise, or excusable neglect.

Defendants contend that relief is no longer available under Rule 15(a), because the November 10 Memorandum and Order dismissed with prejudice the

antitrust claims Automation now seeks to reassert. I disagree. In similar cases in which plaintiffs have moved to amend their complaints after some, but not all, counts were dismissed for failure to state a claim, the Eighth Circuit has considered whether leave should have been granted under Rule 15(a). *E.g., Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065-66 (8th Cir. 2005); *Doe v. The Sch. Dist. of the City of Norfolk*, 340 F.3d 605, 615-16 (8th Cir. 2003). Although other cases have pointed out that Rule 15(a) does not apply after an entire complaint has been dismissed, those cases note that a court may still grant leave to amend in an appropriate case, as part of a Rule 59 or Rule 60(b) motion. *See, e.g., Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1050 (8th Cir. 2010); *Briehl v. General Motors Corp.*, 172 F.3d 623, 629 (8th Cir. 1999). Because Automation's complaint has not been dismissed in its entirety and no final judgment has been entered, I will exercise my discretion to consider the motion to amend under the standards of Rule 15(a).

As mentioned above, Rule 15(a)(2) provides that leave to amend shall be freely granted when justice so requires. Even so, leave to amend may be denied when plaintiff does not have at least colorable grounds for relief, or is guilty of undue delay, bad faith, or dilatory motive; or if it would unduly prejudice the opposing party. *E.g., Foman v. Davis*, 371 U.S. 178, 182 (1962); *Doe*, 340 F.3d at 616. Although delay alone is generally an insufficient reason to deny leave to

amend, it may be sufficient "if the party is seeking to amend the pleadings after the district court has dismissed the claims it seeks to amend, particularly when the plaintiff was put on notice of the need to change the pleadings before the complaint was dismissed, but failed to do so." *Moses.com*, 406 F.3d at 1065; *accord Doe*, 340 F.3d at 616.

After reviewing the record, the parties' briefs, and Automation's proposed amended complaint, I conclude that leave to amend should be denied. As an initial matter, I conclude that Automation's delay would be sufficient reason to deny the amendment.[1] However, I base my denial not on the delay, but on the futility of the proposed amendment.

The proposed amendments fail to cure the deficiencies in the original complaint. The November 10 Memorandum and Order dismissed with prejudice Automation's antitrust claims alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Missouri-law equivalent, because Automation failed to plausibly allege a conspiracy among defendants, and failed to plausibly allege Emerson's monopoly power in any relevant market. Automation now moves to re-assert those claims by alleging that: (1) defendants refused to certify Automation's products as approved by Factory Mutual and FM Approvals,

---

[1] Automation waited almost a month after the dismissal to seek to amend, and this was six months after first being put on notice of the deficiencies through the motion to dismiss. Moreover, some of Automation's new allegations rest on evidence (its own internal memorandum from 1988) that it has had for many years.

and (2) Emerson engaged in a smear campaign against the safety of Automation's products. Automation also asserts that defendants' behavior was the result of an unlawful agreement between defendants: (1) to restrain Automation's sales in the relevant market for all FM-Approved, remanufactured process control equipment, and (2) to monopolize that market. Even if I assume, however, that defendants unlawfully agreed or conspired together,[2] Automation's proposed amended complaint still fails to plausibly allege either that defendants' agreement had a restraining effect on trade in any relevant market, or that Emerson has monopoly power or the dangerous possibility of attaining monopoly power in any relevant market.

Because Automation alleges no per se violations by any defendant, it must allege a plausible relevant market to state claims under Section 1 and 2. *See, e.g., Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009). This is so because a court cannot determine the anticompetitive effect an allegedly illegal act has on competition unless plaintiff provides a well-defined relevant market. *Id.*; *see also Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995) ("Antitrust claims often rise or fall on the definition of the

---

[2]I note, however, that the main source of Automation's conspiracy allegations is its own internal memorandum from 1998, which, as discussed above, had been in its possession for more than ten years before Automation filed its original complaint. Aside from failing to clarify the exact nature of any alleged agreement between the FM defendants and Emerson, the hearsay contained in this memorandum and its self-serving nature make it doubtful that the memorandum would be admissible as evidence in support of Automation's claims.

relevant market."). As a general rule, a valid relevant market has two components: a product market and a geographic market. *See, e.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe, Co v. United States*, 370 U.S. 294, 325 (1962); *accord Double D*, 136 F.3d at 560 (the relevant product market includes all reasonably interchangeable products). The relevant geographic market consists of the geographic area in which consumers can feasibly seek alternative products, or "the market area in which the seller operates." *Double D*, 136 F.3d at 560 (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

In its proposed amended complaint, Automation alleges that the relevant product market is "the market for FM Approved Process Control Equipment used for maintenance, repair and/or overhaul of existing industrial piping systems used in Government Regulated locations." In other places in its complaint, Automation asserts that several original equipment manufacturers, including Emerson, create new process control equipment, which is used to control and/or regulate the flow of hazardous substances through piping systems. It also alleges that consumers who use process control equipment are required to use equipment that has been

approved by a Nationally Recognized Testing Laboratory, such as FM Approvals, Inc. Automation alleges that customers purchase their equipment from several entities, including original equipment manufacturers such as Emerson, and remanufacturers such as Automation. Some of the new and remanufactured equipment satisfies the government regulations, including Emerson's, because it has been certified as approved by the FM defendants; but some of the remanufactured process control equipment – including Automation's brand of remanufactured Emerson process control equipment – does not, because the defendants allegedly have conspired to prevent Automation from receiving this certification.

On its face, Automation's amended relevant market now includes all FM-Approved remanufactured process control equipment – whether originally manufactured by Emerson or by some other original equipment manufacturer. This broader definition both fails as a matter of law and is inconsistent with Automation's other allegations. In antitrust cases, the purpose of considering a plaintiff's proposed relevant market is to determine whether the plaintiff has plausibly alleged that the defendant has restrained trade in the market through its unlawful actions or maintains monopoly power over that market. *See, e.g., Brown Shoe Co.*, 370 U.S. at 325; *Little Rock*, 591 F.3d at 596; *see also, e.g., SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999) ("The

purpose of defining a relevant market is to assist in determining whether a firm has market power."). Automation's inclusion of all FM-approved remanufactured process control equipment of any brand may well make their product market definition more in tune with the realities consumers face, but it also eviscerates Automation's conclusory claim that Emerson maintains a monopoly over this market. Indeed, in contrast to that allegation, the other allegations in Automation's proposed amended complaint reveal that several original equipment manufacturers and remanufacturers create FM-Approved remanufactured process control equipment. Automation's own internal memorandum from 1998, which is attached to its proposed amended complaint, reveals that at least one other original equipment manufacturer, Foxboro Instruments, is FM Approved and was willing to work with Automation to help certify Automation's own remanufactured products as FM approved. As with its original complaint, these allegations reveal a market with several participants with FM-Approved remanufactured process control equipment, rather than a market over which Emerson maintains a monopoly.

However, reading through the rest of Automation's proposed amend complaint, I am led to believe that Automation actually alleges, once again, that the relevant market includes only FM-Approved, remanufactured, *Emerson-brand* process control equipment. In particular, Automation takes great pains to explain

that process control equipment consumers are "locked in" to purchasing only the remanufactured equipment of the same brand as the brand of equipment they are replacing, because of economically infeasible costs associated with using remanufactured equipment of a different brand from the one being replaced. It also alleges Emerson maintains a monopoly over the market for its own brand of remanufactured products, because it has used scare tactics to frighten consumers into only purchasing its FM-Approved brand of remanufactured products, and because consumers who comply with government regulations must purchase only this equipment. Thus, Automation's proposed amended complaint seeks once more to limit the proposed market to the after-market for FM-Approved and remanufactured Emerson-brand process control equipment.

I have the same concerns with this proposed aftermarket definition as I did before. Although Automation now attempts to provide more factual detail to support its claims that consumers are "locked in" to this market, it also fails to provide anything other than conclusory allegations that Emerson charges supra-competitive prices in this market or maintains a monopoly in it. *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 383 (3d Cir. 2005) (factors a court should consider before limiting the relevant market to the aftermarket for one brand's products include: (1) supracompetitive pricing, (2) defendant's dominant share of the relevant aftermarket; (3) significant information

costs; and (4) high switching costs that serve to "lock in" a defendant's aftermarket customers).

In any event, Automation's proposed product market definition fails for a simpler reason: it does not account for the interchangeability of both remanufactured and new process control equipment of different brands. *See Little Rock*, 591 F.3d at 596 ("The relevant product market should include 'products that have reasonable interchangeability for the purpose for which they are produced.'") (quoting *E.I. du Pont*, 351 U.S. at 404). Although Automation claims in conclusory fashion that process control equipment from different manufacturers is not interchangeable, its other allegations belie that claim: "The substitution of a standardized item throughout the plant with another competing manufactures [sic] is not taken lightly nor without serious deliberation." Automation's own allegation that Emerson's products are interchangeable – albeit at a high cost – with other manufacturers' products is fatal to its claim that the relevant product market must be limited only to Emerson's products. *Compare Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 457, 482 (1992) (limiting the relevant market definition to the aftermarket for Kodak products, and noting, "Kodak parts are not compatible with other manufacturers' equipment, and vice versa."); *cf. also Little Rock*, 591 F.3d at 598 ("We conclude that, as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of

payment when there are other methods of payment that are acceptable to the seller."). Because Automation's amendments still fail as a matter of law to plausibly allege that Emerson has a monopoly in, or that its alleged agreement with the other defendants has a restraining effect upon, any relevant market, its amendments are futile, I will deny its motion to amend. *See, e.g., In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1208 (8th Cir. 2010).

## II.     Motions to Strike

Next, both Emerson and Automation file motions under Fed. R. Civ. P. 12(f) to strike portions of one another's respective pleadings. Emerson first moves to strike portions of Automation's original complaint pertaining to Automation's dismissed antitrust claims, while Automation moves to strike some of Emerson's affirmative defenses, contending they contain insufficient factual detail. Automation opposes Emerson's motion, but Emerson has responded with a request for leave to amend its answer. Automation does not oppose that request. Although, as Automation points out, Emerson should have requested leave in a motion, I will grant Emerson's request to amend its answer because it is unopposed. Accordingly, I will only consider the merits of Emerson's motion to strike portions of Automation's original complaint.

Under Fed. R. Civ. P. 12(f), a court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Motions to strike,

however, are not favored and are infrequently granted, because they propose a drastic remedy. *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007) ("[Striking a party's pleading . . . is an extreme and disfavored measure."); *Stanbury Law Firm, P.A. v. Internal Revenue Serv.*, 221 F.3d 1059, 1063 (8th Cir. 2000). Indeed, although a district court has broad discretion in deciding whether to grant a motion to strike, a matter should not be stricken unless it clearly can have no possible bearing on the subject matter of the litigation. 2 James Moore, et al., *Moore's Federal Practice* § 12.37 [3] (3d ed. 2008).

After reviewing Automation's original complaint, I conclude that Emerson's motion must be denied. Although the November 10 Memorandum and Order dismissed with prejudice Automation's antitrust claims, the factual allegations supporting these claims are also relevant to Automation's remaining Lanham Act, defamation, and tortious Interference claims. For example, as Automation points out in its opposition to Emerson's motion, the allegations about Automation's failure to receive FM Approval certification for its products are relevant to its claims arising from Emerson's alleged false advertising about the superior safety of its own products. Additionally, none of the remaining allegations are so scandalous or prejudicial that I must strike them from the complaint. At trial, defendants may file motions in limine to prevent Automation from presenting

irrelevant evidence, but there is no reason now to strike any allegations from Automation's complaint.

### III. Additional Motions to Amend

The Case Management Order granted the parties until January 31, 2011, to file additional motions to amend. Counterclaimant Fisher Controls filed a motion for leave to file an amended counterclaim, but plaintiff Automation asked that I extend the time so it would not have to seek amendment until it knew whether its pending amendment would be allowed. I agree that a short extension is appropriate. I will extend the deadline for filing motions to amend the pleadings to February 10, 2011, but no other Case Management deadlines will be changed. The parties must respond to any motions to amend within the time set by the Local Rules.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Emerson's motion to strike [#56] portions of plaintiff Automation's complaint is denied.

**IT IS FURTHER ORDERED** that plaintiff Automation's motion to amend [#62] is denied.

**IT IS FURTHER ORDERED** that defendant Emerson's request to amend its answer is granted, and its amended answer is deemed filed as of this date.

**IT IS FURTHER ORDERED** that plaintiff Automaton's motion to strike [#70] is denied as moot.

**IT IS FURTHER ORDERED** that plaintiff's motion for extension of time [#95] to amend is granted in part and denied in part, and the deadline for filing motions to amend the pleadings is extended to **February 10, 2011.** No other deadlines are extended, and responses to any pending motions are due by the dates set by Local Rule.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 1st day of February, 2011.