UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PROCESS CONTROLS INTERNATIONAL, INC., d/b/a AUTOMATION SERVICE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:10CV645 CDP |
| EMERSON PROCESS MANAGEMENT, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Pending before me are numerous motions for summary judgment by all parties. I will grant in part and deny in part the motions for the reasons discussed below. This case remains set for trial on the two-week docket beginning December 3, 2012.

## Undisputed Facts

Defendant Emerson[1] is an original equipment manufacturer (OEM) of process control equipment, which is used to control and/or regulate the flow of hazardous substances through piping systems. Plaintiff is Process Controls International, Inc., doing business as Automation Service (Automation).

---

[1] Emerson Process Management, Fisher Controls, International, LLC, and Rosemount, Inc. are all entities within the Emerson company.

Automation and several other companies, including Emerson through its Encore brand, remanufacture the process control equipment because some consumers prefer to replace their worn-out equipment with used, but remanufactured equipment rather than brand-new equipment.[2]  Factory Mutual Insurance Company insures industrial companies that use process control equipment.  Its subsidiary, defendant FM Approvals, LLC has established safety standards for these companies and certifies certain process control equipment as "FM approved" if it satisfies those safety standards.  Many Emerson products are FM approved and bear the FM Approvals trademark.  Automation has not been approved as a repairer of process control equipment by FM Approvals.

When Automation remanufactures Emerson equipment, it sometimes leaves the Emerson and FM Approvals trademarks on the equipment.  This practice has led to on-going disputes between Emerson and Automation, with Emerson contending that Automation is wrongfully using Emerson's trademarks, and Automation contending that Emerson unfairly keeps it from competing in the marketplace for remanufactured Emerson products.  The latest iteration of this dispute ended with a settlement agreement between the parties and a release of

---

[2]Whether Automation reconstructs or repairs the process control equipment is a legal question discussed more fully below.  I use the word "remanufacture" here to reflect the parties' pleadings, but in no way intend its use to imply any legal conclusions regarding Automation's activities.

their claims against one another for any activities that occurred before December 3, 2007.

## Legal Standard

The standards for summary judgment are well settled.  In determining whether summary judgment should issue, the court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact, and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material facts exists.  Fed. R. Civ. P. 56(e).  At the summary judgment stage, I will not weigh evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue of material fact.  *Anderson*, 477 U.S. at 249.

## Discussion

I.    Automation's Claims for False Advertising, Tortious Interference, and Defamation

Emerson has moved for summary judgment as to counts 9, 10, and 11 of Automation's third amended complaint.  These three counts are brought against Emerson, and allege, respectively, false advertising, tortious interference with business expectancy, and defamation.  Automation alleges that Emerson has falsely and publicly asserted that products remanufactured by Emerson are safer than products remanufactured by Automation.

>    A.   *Claims arising before December 2007 are barred by the settlement agreement between the parties.*

Automation and Emerson entered into an agreement, effective December 3, 2007, to settle all claims related to a prior lawsuit between the parties.  That agreement contains a release that states, in part:

> Automation Service . . . hereby releases and forever discharges Fisher[3] . . . from any and all manner of claims, causes of action, demands for arbitration or mediation, or other manner of action, formal or informal, whether known or unknown, of every nature and type whatsoever that they may have heretofore had, now have, or, but for this Agreement, might hereafter have had against Fisher . . . connected with, resulting from, or arising out of:
>> (i)    any and all transactions or occurrences that were alleged or could have been alleged in the aforesaid Complaint, Automation Service's answer to the Complaint, or any counterclaim brought in response to the Complaint; and/or

---

[3]Fisher entered the Agreement on behalf of all "Fisher-Related Companies," which the Agreement defines as "Fisher; Fisher Rosemount Systems, Inc.; Rosemount, Inc.; Emerson Electric Co.; any other company in which Fisher owns a controlling interest; any other company that owns a controlling interest in Fisher; and any other company owned or controlled - directly or indirectly - by, or under common control with, Fisher or Fisher's parent, Emerson Electric Co."

(ii)    any and all transactions or occurrences between Fisher
and Automation Service that have occurred before the
date of this Agreement;

Docket No. 7 at 11-12.

Automation's expert witness, in calculating damages for these counts,
included in his analysis some statements from Emerson allegedly made or received
before December 3, 2007.  Automation argues that even though the statements
were made before December 3, 2007, it can recover if some of the damages arose
after that date.  It also says that the claims now asserted were "unknowable" at the
time of the settlement and therefore not waived by the release.  Docket No. 285 at
11-12.  This position is in complete contradiction to the plain language of the
settlement agreement.  *See Grant Cnty. Sav. & Loan Ass'n, Sheridan, Ark. v.
Resolution Trust Corp.*, 968 F.2d 722, 724 (8th Cir. 1992) (holding that language
in a release must be given its plain, ordinary meaning).  All of Automation's
claims arising from pre-December 2007 statements are therefore barred by the
release.

   B.    *Automation has not produced sufficient evidence to prove damages.*

Each of counts 9 through 11 requires a showing of damages.  *See Rusk
Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671, 679 (Mo. Ct. App. 1985)
(tortious interference); *Nazeri v. Mo. Valley College*, 860 S.W.2d 303, 313 (Mo.
1993) (defamation); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1336 (8th

- 5 -

Cir. 1997) (false advertising).  To support this element of its claims, Automation has produced evidence of lost profits in the form of an expert report by Michael Prost.

To recover lost profits damages, the plaintiff must produce evidence that "provides an adequate basis for estimating the lost profits with reasonable certainty."  *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 115 S.W.3d 50, 54-55 (Mo. 2005).  The plaintiff must establish with reasonable certainty "both that the defendant's actions caused the plaintiff to lose profit and the amount of those damages."  *Metro. Express Servs., Inc. v. City of Kansas City, Mo.*, 71 F.3d 273, 275 (8th Cir. 1995).

Automation has not produced evidence to show with reasonable certainty that Emerson's statements caused any of Automation's customers to reduce their business with Automation.  The only evidence Automation has produced is Prost's damages report.  While Prost relied on some letters, emails, and articles written by Emerson, there is little evidence that any of Automation's customers received, reviewed, or took action based on the communications.[4]

Automation relies on Prost's report to show that its sales to customers dropped after the point of alleged contact.  However, Prost's report does not prove

---

[4]Many of the communications also predate December 3, 2007, and thus cannot provide a basis for any damages, as discussed above.

causation; in fact, it assumes it.  Docket No. 259-2 at 4 ("The assumption that I made was that due to the contact of the customer, sales suffered . . . I was not asked to do anything on the causation side").  Automation also relies on *Rusk Farms* to argue that causation can be inferred since Automation had an ongoing business relationship with customers and sales dropped after the dates of alleged contact.  The evidence does not support this inference.  In *Rusk Farms*, there was evidence that customers actually received a letter from defendants, that the letter explicitly warned the customers that the turkeys at issue were already under contract, and that those customers then did not buy the turkeys; sales completely ceased immediately after each customer received the letter.  689 S.W.2d at 680.  But here Automation has not produced evidence sufficient to show that any customers received, reviewed, or relied on the alleged contacts from Emerson.  Even if the communications were received by Automation's customers, the communications were much less specific than those in *Rusk Farms*.  And the sales trend lines produced by Automation show that after the date of contact there was not a complete cessation of sales.  Rather, sales to some customers show a slow decline, while others even show an increase.  Docket No. 284-4.  Automation has thus not provided sufficient evidence to show causation of damages.

I will therefore grant Emerson's motion for summary judgment with regard to counts 9 through 11 of Automation's complaint.

II.   Emerson's Patent Infringement Claims

Both Automation and Emerson have moved for summary judgment on counts 5 and 6 of Emerson's fourth amended counterclaim.  Counts 5 and 6 allege that Automation infringes U.S. patents 7,516,043 and 5,532,925, respectively, by remanufacturing the DVC6000 series digital valve controllers.  Automation does not dispute that the '043 and '925 patents read on the remanufactured DVC6000 controllers, nor does it challenge the validity of the patents.  The only issue for summary judgment is whether Automation's activities constitute permissible repair that do not infringe the patent.  "Whether a defendant's actions constitute a permissible repair or an infringing reconstruction is a question of law." *Aktiebolag v. E.J. Co.*, 121 F.3d 669, 672 (Fed. Cir. 1997).

The Supreme Court has defined when repair activities infringe a patent: Impermissible "reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to in fact make a new article after the entity, viewed as a whole, has become spent."  *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 365 U.S. 336, 345 (1961) (internal citations and quotations omitted).  The courts have taken an expansive view of what constitutes permissible repair.

In *General Electric Company v. United States*, 572 F.2d 745 (Ct. Cl. 1978), the court held that the U.S. Navy's activities regarding a gun mount for its ships

constituted permissible repair.  *Id.* at 784.  The Navy took decades-old gun

mounts, sent them to a factory, overhauled the sixty percent of mounts that were

serviceable, and scrapped the remaining forty percent for parts.  *Id.* at 780.  The

mounts were reduced to their smallest separable parts, and those parts which could

not be repaired were replaced, mostly by parts previously obtained from plaintiff

G.E.  *Id.*  Parts such as seals, bearings, and wiring were also replaced, though the

court did not identify the source of those parts.  *Id.*  The parts were reassembled

with no attempt to return them to the gun mounts from which they were originally

taken, nor were the mounts necessarily sent to their original ships.  *Id.* at 781.  The

court held that applying this process to a single gun mount would constitute

permissible repair, and so use of the assembly-line method "was simply a speedier,

less expensive, more efficient, and more effective means of refurbishing the gun

mounts," and was thus permissible.  *Id.* at 786.

A similar conclusion was reached in *Dana Corporation v. American

Precision Company, Inc.*, 827 F.2d 755 (Fed. Cir. 1987).  In *Dana Corp.*, the

alleged infringer acquired worn truck clutches as trade-ins, which it then

disassembled, cleaned, sorted into bins, and reassembled using a production-line

process.  *Id.* at 756-77.  When there were insufficient parts in the bins, new parts

were used.  *Id.* at 757.  As in *General Electric*, the court held that "use of the

production-line *method* cannot convert . . . permissible repair to impermissible

reconstruction." *Dana Corp.*, 827 F.2d at 759 (emphasis in original). Further, in determining whether the trade-in clutches were "spent," the court held that it was the physical characteristics of the worn clutch that mattered, and not the owner's evaluation of the clutch's condition or economic value. *Id.* at 760.

The basics of Automation's remanufacture process are undisputed. Automation obtains used or inoperative DVC6000 controllers from third-party users. Automation disassembles the controllers, tests the parts, and discards those that do not work or are beyond repair. Salvageable parts are cleaned and placed in bins. When a customer wants a DVC6000 controller, the necessary parts are removed from the bins, assembled, and sold and delivered to the buyer. Some hardware, such as nuts, bolts, screws, gaskets, o-rings, glass, and gauges are purchased from third parties as needed. This process is comparable to both *General Electric* and *Dana Corp*.

Nonetheless, Emerson argues that Automation commits impermissible repair for four reasons: (1) Automation admits in its pleadings and marketing materials that it reconstructs rather than repairs equipment; (2) Automation procures parts from third-party vendors; (3) the controllers procured by Automation are "spent;" and (4) Automation customizes its orders for customers. First, Emerson points to Automation's pleadings and marketing materials as judicial admissions that its activities constitute impermissible reconstruction. *See,*

*e.g.* Docket No. 183 at ¶ 14 ("Remanufacture is different than repair"); Docket No. 252-5 at 16 ("Instead of simply repairing your old unit, have us remanufacture your units").  Judicial admissions pertain only to matters of fact.  *State Farm Mut. Auto Ins. Co. v. Worthington*, 405 F.2d 683, 686 (8th Cir. 1968).  The repair versus reconstruction issue is a question of law.  *Aktiebolag v. E.J. Co.*, 121 F.3d at 672.  Furthermore, there is nothing in any of Automation's materials that indicates the distinction between repair and remanufacture was intended to connote a technical legal attribution, rather than a practical way of distinguishing between degrees of repair.  *See Vogrin v. Hedstrom*, 220 F.2d 863, 866 (8th Cir. 1955); *General Electric,* 572 F.2d at 779 (U.S. Navy differentiated between varying degrees of maintenance, all of which were held to constitute permissible repair).

Regarding Automation's procurement of parts from third parties, Emerson relies on *General Electric* to argue that this takes Automation's activities outside the realm of permissible repair.  In holding that the Navy conducted permissible repair on its gun mounts, the court noted as a "significant fact" that "Of the 17 elements of the patented combination . . . G.E. appears to have itself supplied the defendant . . . with at least fifteen elements."  *Id.* at 781.  Even though this fact was "cardinal" to the court's decision, *id.* at 782, *General Electric* does not require that every replacement item be purchased from the patentee, as Emerson suggests.

The use by Automation of third-party nuts, bolts, screws, gaskets, o-rings, glass, and gauges therefore does not transform an otherwise permissible repair into an impermissible reconstruction.

Emerson also argues that the DCV6000 controllers remanufactured by Automation are "spent."  It is undisputed that Automation acquires the controllers it remanufactures from third parties who have discarded them or placed them in scrap bins.  Other controllers were recovered after being damaged in Hurricane Katrina, and were full of salt water and heavily corroded.  Docket No. 254-5 at 2.  However, neither of these sets of controllers are "spent" as defined by the caselaw.  *See Aro Manufacturing*, 365 U.S. at 345.  In *Dana Corp.*, used clutches were also recovered through a reclamation program from third-party users.  827 F.2d at 760.  The court dismissed the plaintiff's argument that "whether the patented product is 'spent' should turn on the owner's economic evaluation of the product, rather than on an examination of its physical characteristics."  *Id.*  Additionally, the corrosion and flooding of the Katrina-recovered controllers does not make them "spent."  *See Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422 (1964).  In *Wilbur-Ellis*, a second-hand purchaser recovered fish-packing machines that were "corroded, rusted, and inoperative," and returned them to working condition.  *Id.* at 423.  The Court held that they were not spent, reasoning, "They had years of usefulness remaining though they needed cleaning and repair."  *Id.* at 424.

- 12 -

In *Aktiebolag*, the court found that replacement of a drill tip constituted impermissible repair because the drill tip was not manufactured to be a replaceable part, there was no evidence of a substantial market for retipping, and the patentee never intended for its drills to be retipped. *Id.* at 674. But in this case, Emerson's controllers have readily replaceable parts, there is a substantial market for the repaired products, and Emerson must have intended for the controllers to be repaired in this manner, since it itself if one of several companies doing the same type of repairs as Automation.

Finally, Emerson cites no cases to support its position that customization indicates impermissible reconstruction, but instead relies on the testimony of its expert, Dr. Albert Karvelis. Dr. Karvelis's testimony is ultimately a legal analysis, and is therefore inadmissible. *See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320, F.3d 838, 841 (8th Cir. 2003). The actual caselaw does not support this position. For instance, in *Wilber-Ellis*, the machines had originally been constructed to pack fish into one-pound cans, but were remanufactured to pack fish into five-ounce cans. 377 U.S. at 423. Nonetheless, the Court held that, "Petitioners in adapting the old machines to a related use were doing more than repair in the customary sense; but what they did was kin to repair for it bore on the useful capacity of the old combination." *Id.* at 425. Similarly here, Automation's

customization of the DVC6000 controllers does nothing more than "bear on the useful capacity of the old combination."

For the reasons stated above, I conclude that Automation's activities amount to permissible repair of the DVC6000 controllers as a matter of law. I will therefore grant Automation's motion for summary judgment as to counts 5 and 6 of Emerson's counterclaims, and will deny Emerson's motion for summary judgment as to the same counts.

III.    Emerson's Trademark Claim

Automation has moved for summary judgment on count 2 of Emerson's counterclaims, which alleges trademark infringement under the Federal Lanham Act. Emerson alleges that Automation offers remanufactured equipment bearing Emerson-owned trademarks. In moving for summary judgment, Automation argues that it is allowed to retain the trademark under *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 (1947). Automation argues that its activities amount to permissible repair, that it clearly indicates that the items have been repaired, and that the sophisticated consumers of process controls equipment are not likely to be confused by the presence of the trademark.

In *Champion*, the Court upheld the Second Circuit's decree allowing defendant to retain plaintiff's trademark on its refurbished spark plugs so long as they were clearly marked as "repaired." *Id.* at 127-28. While the Court

acknowledged that, "Cases may be imagined where the reconditioning or repair would be so extensive or so basic that it would be a misnomer to call the article by its original name, even though the words 'used' or 'repaired' were added," it held that in the case at hand, the repair of the spark plugs "did not give them a new design" and was "no more than a restoration." *Id.* at 129. Other cases have held that the trademark cannot be retained when defendant's actions result in a "new construction," *Bulova Watch Co. v. Allerton Co.*, 328 F.2d 20, 23 (7th Cir. 1964), or are "structurally different." *Schütz Container Sys., Inc. v. Mauser Corp.*, 1:09CV3609 RWS, 2012 WL 1073153, at *21 (N.D. Ga. Mar. 28, 2012).

Despite Automation's argument to the contrary, this is not an identical test to the permissible repair/impermissible reconstruction question that applies in patent cases. Thus, my holding that Automation's activities constitute permissible repair under *Aro* does not automatically entitle it to judgment on the trademark infringement claims. While the patent cases are chiefly concerned with the physical condition of the invention, *Dana Corp.*, 827 F.2d at 760, *Champion* ultimately turns on the issue, central to trademark law, of whether "the unauthorized use was likely to deceive, cause confusion, or result in mistake." *Nitro Leisure Prods., LLC v. Acushnet Co.*, 341 F.3d 1356, 1359, 1361 (Fed. Cir. 2003); *Champion*, 331 U.S. at 129. The *Champion* line of cases is concerned both with the nature of the repaired product and any disclaimer notifying customers of

- 15 -

its repaired nature.  *Champion*, 331 U.S. at 130; *Nitro*, 341 F.3d at 1364; *Bulova*, 328 F.2d at 23-24.  This analysis is very fact-specific.  The evidence produced in this case shows that Automation does not repair every item in an identical manner, nor are the same disclaimers used for every product.

Genuine issues of material fact remain regarding Automation's alleged trademark infringement, and so I will deny Automation's motion for summary judgment as to count 2 of Emerson's counterclaims.

IV.   Emerson's Other Claims Against Automation

Automation also seeks summary judgment on Counts 1, 3, 4, 7, and 8 of Emerson's fourth amended counterclaims.  These counts claim, respectively, breach of contract, unfair competition under the Federal Lanham Act, false advertising under the Federal Lanham Act, unfair competition under Missouri state law, and misappropriation of trade secrets.  After carefully reviewing the parties' submissions, I find that genuine issues of material fact remain on all of theses claims.  I will therefore deny Automation's motions for summary judgment as to counts 1, 3, 4, 7, and 8 of Emerson's fourth amended counterclaims.

V.   FM Approvals' Certification Mark

Both FM Approvals and Automation have moved for summary judgment on counts 1–4 of FM Approvals' counterclaim.  FM Approvals seeks summary judgment as to liability only.  All counts stem from Automation's use of the FM

Approvals certification marks on its remanufactured process controls equipment.

In Count 1 FM Approvals seeks a declaratory judgment regarding the alleged

trademark violation, and in counts 2, 3, and 4 it alleges, respectively, trademark

infringement, unfair competition under the Federal Lanham Act, and unfair

competition under Missouri state law.  FM Approvals has also moved for

summary judgment on count 12 of Automation's complaint for declaratory

judgment.[5]

FM Approvals is a Nationally Recognized Testing Laboratory (NRTL),

authorized by the U.S. Occupational Safety and Health Administration to test and

certify certain process controls equipment as safe for use in the U.S. workplace.

As such, FM Approvals has provided for three ways to ensure that repaired

equipment remains compliant with its certification standards:  repair by the OEM,

repair by an independent repair facility under FM Approval's Standard 3606, or

repair by an end user that has been approved under 3606.  Docket No. 179-6, 179-

30.  Notably, all three of these methods involve an audit or inspection of the repair

facilities and processes by FM Approvals.  *Id*.; Docket No. 275-7 at 6-7.

Automation does not claim that it has been approved by FM Approvals as a

producer or repairer of process control equipment, but rather argues that as an

---

[5]Automation's count 12 is brought against both FM Approvals and Emerson, but only FM
Approvals has moved for summary judgment on this count.

owner of the equipment it is entitled to repair it according to the OEM's manual without voiding the equipment's FM Approvals certification.  Automation further argues that its repaired equipment meets the FM Approvals certification standards.  This is not the issue; the FM Approvals certification mark does not simply represent the quality of the equipment, but the fact that FM Approvals has in fact inspected the equipment, facility, or repair processes and approved it.  Docket No. 275-7 at 6-7.  Not only does Automation's argument ignore the process for repair approvals, it would completely undermine the value of the certification system, which relies on testing and oversight by a NRTL such as FM Approvals.

Automation also argues that even if its equipment can no longer be classified as "FM Approved," Automation is entitled to retain the FM Approvals mark under *Champion*.  I disagree.  As discussed above, in *Champion*, the Court held that the defendant could retain plaintiff's trademark on its remanufactured sparkplugs in light of the fact that they were clearly disclaimed as being "repaired."  331 U.S. at 127-28.  Central to this decision was the fact that because "inferiority is expected in most second-hand articles . . . [i]nferiority is immaterial so long as the article is clearly and distinctively sold as repaired or reconditioned." *Id.* at 129-30.  However, certification marks are different in nature from other trademarks.  *See, e.g.*, *Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 716 (9th Cir. 2005).  Disclosing that an item is "repaired" may

effectively inform a consumer of the product's nature as compared to a new item of the same origin.  However, simply disclosing that an item is "repaired" does not similarly inform a consumer that the repair process has not been re-audited by the holder of the certification mark it bears.  *See id.* at 721 ("In the certification mark context, the mark holder's ability to institute quality controls seems vital if a mark is to serve its purpose").  *Champion* does not protect Automation's activities with regard to the FM Approvals certification mark.

Accordingly, Automation's activities were "likely to cause confusion, or to cause mistake, or to deceive."  *See SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1090-91 (8th Cir. 1980).  FM Approvals has produced evidence not only of likely confusion, but of actual customer confusion.  *See, e.g.*, Docket No. 267-21 at 3-4, 7, 10; 267-33 at 5; 267-36 at 5-6.  Automation does not dispute this evidence except to argue that no confusion could exist because its products are, in fact, still allowed to be marketed as FM Approved even though FM Approvals has not actually approved the repairs or Automation's facilities or systems for making those repairs.  While the parties argue over which standards and factors should be used in evaluating likelihood of confusion, the evidence of actual confusion makes those arguments moot.  *SquirtCo.*, 628 F.2d at 1091 ("Actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion").

Finally, Automation argues that it is entitled to summary judgment on FM Approvals' declaratory judgment action, relying on a recent case where I stated that, "The purpose of the Declaratory Judgment Act . . . in patent cases is to provide the allegedly *infringing party* relief." *American Piledriving Equipment, Inc v. Hammer & Steel, Inc.*, 4:11CV811 CDP, 2012 WL 1414837, at \*3 (Apr. 24, 2012) (internal citations omitted) (emphasis added).  It is true that when FM Approvals – the trademark owner – brought this declaratory judgment claim, it reversed the roles of the parties in a typical declaratory judgment action.  *See Geisha, LLC v. Tuccillo*, 525 F. Supp. 2d 1002, 1010 (N.D. Ill. 2007). Nonetheless, such declaratory judgment actions are still available if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)); *Geisha*, 525 F. Supp. 2d at 1013. This is not a case of uncertain prospective infringement – here the evidence shows that there is a real possibility of infringing activity going forward.  *See Geisha*, 525 F. Supp. 2d at 1018.  Nor is this a case, like *American Piledriving*, where the intellectual property owner is barred from recovering damages and a declaration would have no practical effect.  2012 WL 1414837 at \*3.  Accordingly, declaratory judgment is appropriate.

For the reasons stated above, I will grant FM Approvals' motion for summary judgment on liability for counts 2 through 4 of its counterclaims.  The issue of damages under those counts remains for trial.  I will also grant FM Approvals' motion for summary judgment for declaratory judgment under count 1 of its counterclaims.  I will deny Automation's motion for summary judgment as to counts 1 through 4 of FM Approvals' counterclaims.  I will grant FM Approvals' motion for summary judgment dismissing count 12 of Automation's complaint for declaratory judgment, only as to defendant FM Approvals.

## Conclusion

The following claims remain for trial.  From Automation's third amended complaint:  count 12 for declaratory judgment, against defendant Emerson only.  From Emerson's fourth amended counterclaim:  count 1 for breach of contract, count 2 for trademark infringement, count 3 for unfair competition under the Federal Lanham Act, count 4 for false advertising under the Federal Lanham Act, count 7 for unfair competition under Missouri state law, and count 8 for misappropriation of trade secrets.  From FM Approvals' counterclaim, damages only on each count:  count 2 for trademark infringement, count 3 for unfair competition under the Federal Lanham Act, and count 4 for unfair competition under Missouri state law.

Accordingly,

**IT IS HEREBY ORDERED** that Emerson's motion for summary judgment [#251] as to counts 5 and 6 of Emerson's fourth amended counterclaim is denied.

**IT IS FURTHER ORDERED** that Automation's motion for summary judgment [#256] as to counts 1–7 of Emerson's fourth amended counterclaim is granted as to counts 5 and 6 only, and is denied in all other respects.

**IT IS FURTHER ORDERED** that Emerson's motion for summary judgment [#257] as to counts 9–11 of Automation's third amended complaint is granted.

**IT IS FURTHER ORDERED** that Automation's motion for summary judgment [#262] as to counts 1–4 of Factory Mutual's counterclaim is denied.

**IT IS FURTHER ORDERED** that Automation's motion for summary judgment [#264] as to count 8 of Emerson's fourth amended counterclaim is denied.

**IT IS FURTHER ORDERED** that Factory Mutual's motion for summary judgment [#266] as to counts 1–4 of Factory Mutual's counterclaim and count 12 of Automation's third amended complaint is granted.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of October, 2012.